# Richmond.

## R. & D. RAILROAD CO. v. PICKLESEIMER.

### February 21st, 1889.

1. CONTRIBUTORY NEGLIGENCE consists in such acts or omissions of plaintiff, amounting to want of ordinary care, as co-operating with negligent acts of defendant, are the proximate cause of the injury.

2. IDEM—*Negligent injuries—Case at bar.*—Plaintiff, a live-stock shipper on defendant's freight train, with driver's pass from Charlotte to Richmond, was told by conductor before reaching Danville that there the caboose would be detached and he have to walk or ride atop of stock-car over Dan river bridge. Reaching Danville about 9½ P. M., train stopped some moments, ·during which plaintiff agreed with brakeman to stay and guard wood on caboose platform, latter to notify former when to get atop stock-car. Plaintiff did so. Shortly trains moved up slowly. When he was about to get atop from platform of caboose, it was cut loose, and some one said, "jump down." This plaintiff did, and overtook rear of train fifteen or twenty feet from caboose. It was dark and drizzly. Reaching car, overcoat on and broad, flat, rectangular valise in hand, he passed to the right side and attempted to ascend a ladder to the top, the train being then in motion. ·Climbing up, just as he threw his valise over the hand-hold on the top of the car, he fell some twenty feet to the ground and was injured. In action for damages; HELD:

   Plaintiff not entitled to recover, the evidence disclosing on plaintiff's part contributory negligence operating as the proximate cause of the injuries complained of, without which they could not have happened, this case not falling within the class where passenger is excused for his rash act by reason of imminent peril due to defendant's negligence.

3. INSTRUCTIONS.—In this case, after instructing the jury as to the law of contributory negligence, the trial court added: "A plaintiff may under certain circumstances, be entitled to recover damages for an injury,

although he may, by his own negligence, have contributed to produce it."

HELD:

> Erroneous because misleading.

Error to judgment of corporation court of Danville in an action of trespass on the case wherein T. W. Pickleseimer was plaintiff and the Richmond and Danville . Railroad Company was defendant, to recover damages from said company for injuries to the person of the plaintiff while a passenger over the defendant's road as a shipper of stock, and having a "stock drover's pass" as such shipper from Charlotte, in the State of North Carolina, to Richmond, Virginia; the alleged injuries having been received at Danville, Virginia, an intermediate point along said company's railway, between Charlotte and Richmond aforesaid, on the 16th of February, 1884.

The declaration contains four counts, in which the statement of the plaintiff's case is varied as usual, each of the counts being, in effect, practically the same, though in some of them wilful negligence is charged. The defendant company demurred to the declaration, and to each count thereof; but the court overruled the demurrer, whereupon the defendant pleaded "not guilty," and on that plea issue was joined.

At the trial the defendant excepted to the action of the court rejecting certain evidence offerred by it, in overruling the defendant's objections to certain instructions asked for by the plaintiff, and giving the same as asked to the jury, and in refusing two instructions asked for by the defendant and giving one instruction of its own in lieu thereof, all of which appears in the defendant's several bills of exception, numbered from 1 to 3, inclusive.

The jury found for the plaintiff, and assessed his damages at $10,000; whereupon the defendant moved the court to set aside the verdict and award a new trial, on the ground that the same was contrary to the law and the evidence, but the court overruled the motion and rendered judgment in accordance with the

finding of the jury, and the defendant excepted, and the court certified, not the facts, but all the evidence in the cause; and the case is here on a writ of error and *supersedeas* to said judgment.

*Staples & Munford*, for plaintiff in error.

*W. H. Mann*, for defendant in error.

RICHARDSON, J., delivered the opinion of the court.

After a most careful investigation of every question presented by the record, we are clearly of opinion that the case, as presented by the evidence in the record, is plainly one of contributory negligence on the part of the plaintiff, operating as the proximate cause of the injuries complained of, without which the mischief could not have occurred; and, therefore, the case may well be disposed of and the judgment of the court below reversed, on consideration of the plaintiff's evidence alone, as required by the rule of decision prescribed by section 3484, Rev. Code of 1887.

This rule, however harsh and oppressive its operation must be in many cases, fortunately interposes no bar to the real justice of this case. Under the rule, the trial court having certified, not the facts, but the evidence, the attitude of the plaintiff in error is that of a demurrant to evidence.

The subject of contributory negligence has been so often considered, and the rule in respect thereto so clearly laid down in numerous cases by this court, that it would seem easy of determination whether any given case is or not within the rule so laid down. But the question is here again presented, and we have to consider whether, in the present case, there was such contributory negligence on the part of the plaintiff (defendant in error) as to preclude the right of recovery by him; or, to state it differently, conceding that the defendant (plaintiff in error)

was negligent and even culpably so, was the plaintiff's negligence the proximate cause of the injury received by him ?

Contributory negligence consists, in contemplation of law, in such acts or omissions, on the part of the plaintiff, amounting to a want of ordinary care, as concurring or co-operating with the negligent acts of the defendant, are a proximate cause or occasion of the injury complained of. It is a general principle, firmly imbedded in the law and conclusively settled, that such negligence will defeat a recovery. Beach on Con. Neg. 14. And in *Pennsylvania R. R. Co.* v. *Aspell,* Black, C. J., said: "It has been a rule of law from time immemorial, and it is not likely to be changed in all time to come, that there can be no recovery for an injury caused by the mutual default of both parties. When it can be shown that it would not have happened except for the culpable negligence of the party injured, concurring with that of the other party, no action can be maintained." And Mr. Beach, citing the case just referred to, says: "From *Butterfield* v. *Forrester* (11 East, 60), to the latest judgments of the appellate courts in every common law jurisdiction, the rule is consistently and uniformly declared"; citing, in a note, a great number of authorities, and among them the leading English case of *Tuff* v. *Waunan,* 5 C. B. (N. S.) 573, and the decisions of this court in *R. & D. R. R. Co.* v. *Morris,* 31 Gratt. 200, and *Same* v. *Anderson,* Id. 812. See Beach on Con. Neg. p. 15, note 2.

In the last named case, Burks, J., fully and clearly stated the rule, with the qualification thereto, from *Tuff* v. *Waunan, supra,* as follows: "It appears to us that the proper question for the jury in this case, and, indeed, in all others of a like kind, is whether the damage was occasioned entirely by the negligence or improper conduct of the defendant, or whether the plaintiff himself so far contributed to the misfortune by his own negligence or want of ordinary and common care and caution that but for such negligence or want of ordinary care and caution on his part the misfortune would not have happened. In the first case,

the plaintiff would be entitled to recover; in the latter, not; as, but for his own fault, the misfortune would not have happened."

And then Judge Burks proceeded to state the qualification to the rule, as laid down by the English judge, as follows: "Mere negligence or want of ordinary care or caution would not, however, disentitle him (the plaintiff) to recover, unless it were such that but for that negligence and want of ordinary care and caution the misfortune could not have happened; nor, if the defendant might, by the exercise of care on his part, have avoided the consequences of the neglect or carelessness of the plaintiff.

In *Dunn* v. *Seaboard and Roanoke R. R. Co.*, 78 Va. 645, in an elaborate and well considered opinion, after reviewing a great number of authorities bearing on the rule in question, and the qualifications thereto, Lacy, J., said: "The sole question for this court to decide in this case is, whether a person who is injured by the negligence of another, not wilful or intentional, can recover in an action therefor when he by his own negligence proximately contributed to the injury, so that but for his co-operating fault the injury would not have happened, except where the direct cause of the injury is the omission of the other party, after becoming aware of the injured party's negligence, to use a proper degree of care to avoid the consequences of such negligence." In the same case, Judge Lacy also said: "That a person who, by his own default has brought upon himself a loss or an injury, can claim no loss or compensation for it from another, is a principle of universal application; and it is equally true, that if his imprudence or negligence has so materially contributed to the loss or the injury that but for such imprudence or negligence it would not have occurred, he can claim no recompense from another who has been instrumental in causing it, unless the latter, upon the discovery of the danger into which the party had brought himself by his own fault, could, by the use of such diligence as the extent of the danger and the nature of the threatened injury required, have avoided

the occurrence. If, in other words, the injury, though inflicted by another, was unavoidable by the exercise of proper diligence, by reason of the situation of peril into which the party, by his own neglect, had placed himself, he must be considered as the party solely in fault and as the author of his own misfortune"; citing Hutchinson on Carriers, pp. 502, 505. And in the same case, as well as in the case of *R. & D. R. R. Co.* v. *Anderson, supra,* it was said: "If the injury which the plaintiff sustained was occasioned by the negligence of the defendant, and solely by such negligence, there can be no doubt of the plaintiff's right to recover damages for the injury. But if there was negligence on the part of the defendant, and also on the part of the plaintiff, and the negligence of the latter contributed to the injury, the right of recovery depends upon the circumstances."

In the light of these principles, and looking alone to the evidence of the plaintiff (defendant in error), we have to determine whether the injuries in question are due solely to the negligence of the company, or whether the negligence of Pickleseimer was the proximate cause of the injury.

It is undoubtedly true that Pickleseimer was seriously, if not permanently, injured. There is a great mass of testimony touching the condition, symptons and suffering of Pickleseimer on his continued trip from Danville to Burkeville, where he was left in charge of a physician until he was sufficiently recovered to return to his home in North Carolina; as to the nature and extent of the injury, as testified to by the physician, it appearing that Pickleseimer's collar-bone was broken or knocked down, and that two of his ribs were fractured; and similar testimony as to his condition, suffering, and capacity to earn a support for himself and family since his misfortune as compared to what it was prior thereto—all of which is unimportant here, the injury, as well as its extent and character, being conceded. The question is, was Pickleseimer the author of his own misfortune?

This question must be determined by the testimony adduced by

the plaintiff below (defendant in error), and this is confined to the evidence given by Pickleseimer himself and that of his travelling companion, Thomas Wood.

At Danville, the place of the accident, the company's railway crosses Dan river over and through a bridge owned or in the possession of the company, which is a covered bridge spanning said river and connecting North and South Danville by rail. At each end of the bridge there is an open trestle leading on to the bridge, and over which the railway passes. Pickleseimer, on the occasion in question, was injured by falling from the side of the rear stock-car of the train on which he had travelled from Charlotte, North Carolina, to South Danville, which is that part of the town of Danville on the south side of Dan river. He received the fall, resulting in his being severely injured as aforesaid, while attempting in the darkness of night, with his overcoat on and a valise weighing some eight pounds in his right hand, to mount upon the rear stock-car of the train while in motion, in order to ride thereon over the bridge to North Danville, the cab or caboose in which he had travelled from Charlotte to South Danville having been detached, as was then and before the usage of the company, on reaching a point at a switch near the south end of the bridge trestle on the south end of the bridge. He fell through or over the trestle to the ground below, and was injured as above stated. Danville was what is known to railroad men as the "end of a run." At that point, coming from the south, the "caboose" was detached, when the trains passed over the bridge to North Danville, where the conductor in charge would turn over his train to another conductor from that point to Richmond. This bridge was intended exclusively as a railroad bridge. It had no walkways on either side of the track. But between the rails the track was planked from rail to rail the entire length of the bridge and trestles, making a smooth and comparatively safe walkway all the way over. There were, at that time, no stationary lights kept by the company in the bridge.

Leaving out of view the unimportant evidence above referred to, the case turns entirely upon the evidence of Pickleseimer and that of his travelling companion, Thomas Wood, a most loquacious Scotchman. Indeed, the case turns absolutely upon the evidence of Pickleseimer himself; for he states positively that the train *was in motion* when he attempted to mount to the top of the rear car attached thereto. But as, in any view, the case turns upon the evidence of these two witnesses, and as their evidence, though they disagree in most material respects, demonstrates that Pickleseimer's injuries were brought on him by his own gross negligence and reckless exposure of his person in a position of extreme peril without any real or apparent necessity therefor, we will give their respective statements, or so much thereof as bear upon the real question at issue.

Pickleseimer, after responding to the usual introductory questions, and stating that he was the plaintiff in the action, and had been injured by being "thrown off the trestle," was asked by his counsel to "state to the jury how it was." Ans. "On the 16th of February I left Charlotte, North Carolina, in the morning, and reached Danville between nine and ten o'clock" (evidently meaning at night). "Mr. Wood and myself were enquiring as to how we should cross the river here. I said that we had better ride on a freight box, as I used to, but he said that he didn't like to ride that way. I told him that it was less dangerous, as we had no light and could not see, and did not know when an engine might run on us. When the train stopped I had my valise ready to get out, and one of the train hands said if I would guard the wood he would notify us when to get on top, as they had their wood piled on each end of the caboose, and that he would tell me the proper time to get up." Q. "Was the conductor present?" Ans. "Yes, sir. Presently the train began to draw up slowly, and I still remained on the platform where I was. One of the brakemen told me to jump off, and I grabbed my valise to jump on the ladder. About that time he cut the caboose loose and I had to get on the ground. I got on

the ground, and overtaking the train, I suppose some fifteen or twenty feet, I got up the ladder and throwed my valise up into the hand-hold on the top, and by some means I fell. I don't know what caused it, and that is the last I recollect."

But notwithstanding the witness had made a plain, simple and seemingly honest statement, and had said that it was all he recollected, yet he was pressed by his own counsel with a long list of questions (most of which were as to when and where he had a return of consciousness, the nature of his injuries, the medical treatment received and the expenses incident to his injuries, and his lessened capacity to earn a living for himself and family), and at last brought the witness to a flat contradiction of his statement, formerly made, that the conductor *was present* when one of the train hands procured him to stay and guard the wood, etc. It occurred as follows: Q. " Well, you say when you got to Danville the brakeman told you that if you would stay on the train and guard the wood until the proper time arrived he would notify you when to get on the top ? " Ans. " Yes, sir." Q. " Was this statement made in the presence of the conductor ? " Ans. " I don't know, sir." Q. " Was it before or after it stopped ? " Ans. " I think it was after." Q. " Do you remember whether he had left before that statement was made by the train hands ? " Ans. " Not that I recollect." Q. " Did you stay and guard the wood as the brakeman asked you ? " Ans. " Yes, sir." Q. " You say that at the time you were about to get off the caboose on the car next to it that at that moment the caboose was uncoupled from the balance of the train, and that the balance started forward slowly, and that you had to get down and go some fifteen or twenty feet ? " Ans. " Yes, some short distance to keep the train from getting away from me."

Now, from the above questions and answers, the witness' self-contradiction as to whether the conductor was present when the witness was voluntarily on guard for the brakeman is plain; and it is equally plain that, during the time he stayed guarding

the wood for the brakeman, he could again and again have mounted with safety from the platform of the caboose, by the ladder on the stock-car, to the top of the stock car, in attempting to mount which latter and when in motion, he fell and was injured. It is obvious too, that counsel for the plaintiff felt the damaging effect of the palpable contradiction, as evinced by the questions with which the witness was immediately thereafter plied.

In the cross-examination of Pickleseimer, after explaining the difference between a box-car and a stock-car, he was asked: Q. "Was there any ladder on the stock car at all?" Ans. "I don't know, sir." Q. "Did you undertake to get up on that car by climbing on the slats of the car?" Ans. "I got on the ladder." Q. "You didn't look to see whether it was a box-car closed up all around, or whether it was a stock-car; and you cannot tell which you got on?" Ans. "No, sir." * * * Q. "Did you get upon it while it was in motion?" Ans. "I think I did; I think it was moving; to the best of my knowledge *it was moving.*"

Further on in his cross-examination the attention is again called to the subject, and he is asked: Q. "Then, as I understand you, with your overcoat on and with your valise in hand, you undertook to climb up on this car while it was in motion?" Ans. "Yes, sir." Pickleseimer further testified that he once before shipped cattle over this road on one of the company's freight trains, on which occasion, he says, he was given ample time, and that he crossed the bridge then, lying flat of his back on top of a stock-car, and that it was in broad daylight. Yet, in his testimony in this case, he says he does not remember whether it was an open or a covered bridge.

This statement of Pickleseimer, in view of the principles above laid down, proclaims on its face that by his own culpable negligence, which was the proximate cause of the injury complained of, he is absolutely barred of all right of recovery. Briefly summed up, it is this: That as a shipper of live stock on

one of the company's freight trains, on which train he was rightfully a passenger, with a cattle-drover's pass, he having a lot of cattle on the train on which he travelled from Charlotte, N. C.; that he was informed by the conductor of the train before he reached Danville that the caboose attached to the train, and in which he was travelling, would be detached on arriving at Danville, and that he would have to walk over the bridge over Dan river, at that place, or ride on top of the car; that on reaching Danville, which was about 9:30 o'clock at night, the train stopped, and after standing some moments, during which time Pickleseimer, instead of mounting on the stock-car from the platform of the caboose, where he was standing, during which time he entered into a treaty with a brakeman, who was on the same train, to stay and guard the wood which was piled up on both platforms of the caboose, the brakeman promising to notify him when to get on the stock-car; that he did stay and guard the wood; that in a short time the train moved up slowly, when Pickleseimer was about to get on the stock-car in front from the platform of the caboose, but at that moment the caboose was cut loose, and the brakeman, or some one, said jump down; that he got on the ground and overtook the rear of the train some fifteen or twenty feet from where the caboose was detached and left standing; that the night was dark and cloudy, and a drizzling rain was falling; that reaching the rear car of the train, which was a stock-car, Pickleseimer, with his overcoat on and his valise, a broad and flat one, rectangular in shape, in his right hand, passed to the right side of the car and attempted to ascend by a ladder attached thereto to the top of the car, the train and car then being in motion; that as he climbed up the ladder and just as he threw his valise up over the "hand-hold" on top of the car, he fell and was precipitated to the ground some twenty feet below the track, and thereby was injured as already stated; that he was not conscious until some time after he arrived at Burkeville the next morning; that he did not know whether the car on to which he attempted to climb was a

box-car or a stock-car; and that Pickleseimer had shipped stock over this road once before and crossed this bridge on the top of a stock car, lying flat of his back.

Such is Pickleseimer's case, stated as strongly as it can be from his own testimony.

Now it is in order to give the statement of the witness, Thos. Wood, who was Pickleseimer's travelling companion, and who was also a stock shipper on the same train, and to compare his statement with that of Pickleseimer himself.

The testimony in this case was taken down by a stenographer, a method that seems not to promote brevity, but one that gets on paper and into the record every word said by the witnesses, so as to enable the court to judge of any peculiar bent of the witness' mind and purpose, and to apply the tests of accuracy and truth.

The witness, Thos. Wood, enters into an elaborate statement of all the details from his standpoint, and he does so with evident spirit and dash; but, unfortunately for him, not with commendable regard for consistency.

After stating, in response to preliminary questions propounded to him by counsel for the plaintiff, that he resided in western North Carolina; that he was a native of Scotland, and had resided in this country for thirteen years; and that he was with Pickleseimer on the day when this accident occurred, he was asked: Q. "State to the jury, as near as you can, all the facts from the time you were approaching Danville up to the time he" (Pickleseimer) "was left at Burkeville and you went on to Richmond?" Ans. "Sometime before we reached Danville something was said about crossing the river. I knew we changed trains to go to Richmond. The conductor told me the caboose was cut loose at this side of the river, but the train went over. I wondered how stockmen got across. I went back and said: How do stockmen get across? The conductor told me there were two ways; that they could get up on top of the car or foot it as they chose. I didn't favor either way; I thought there would

be danger either way; and when we got to the abutment of the bridge, I think maybe twenty or thirty feet from a little house close to the abutment of the bridge, the train stopped. As soon as the car clinked against the caboose it was cut loose."

Now, here observe the inconsistency of this statement with that of Pickleseimer, who says that when the train stopped he had his valise and was about to get on the car in front when he entered into the engagement with the brakeman to stay and guard the wood, that he did stay and guard the wood, and that it was some "moments" later when the train moved slowly up, and that he was then about to get on the car in front, from the platform of the caboose, when the latter was cut loose and some one said "jump down," etc. The evident tendency, if not the direct purpose, of Wood's statement was to destroy the interval of time between the stopping of the train and detaching of the caboose, during which Pickleseimer was guarding the wood, and in which he might, as was his first purpose, have got on the car with ease and safety; for, observe, Wood says the caboose was cut loose just as soon as the car "clinked against the caboose."

But the witness proceeds: "As soon as it was cut loose it moved forward a few steps, or a short distance, and we got on to some planks between the rails. While I walked on these planks, they were very loose, the ends jolted underneath my feet. I said, 'What is to be done, are we going to walk or ride?' He said, 'I don't walk.' I didn't like the looks of this riding myself, on account of a conversation before that, when the conductor told *us* that we would either have to ride or foot it across; a young lad there on the bridge said, 'If you ride across, keep low or she will get you,' and he told me about a colored man who got his brains knocked out. However, Pickleseimer was inclined to believe it was the safest way to get over, and, on the spur of the moment, I didn't know what to do. Pickleseimer stepped to the right hand corner and I to the left out on the end of the sleepers, and took hold of one of the slats, valise in my

left hand and overcoat on my arm. At that very moment the train started and went. I stood my ground until the train passed me. I still had a little light, for this brakeman was doing something on the platform of the caboose, and I could still see a little light from his lantern."

Now, observe here that this witness (Wood) is detailing circumstances which, if they occurred, have a most material bearing upon the case, and was obviously intended to sustain the charge in the declaration of wilful negligence, in that at the time of attempting to get on the stock-car, the conductor was present, that the attempt was made by his direction, and that he then and there wilfully permitted or caused the train to be put in motion, and that the injury resulted from such wilful negligence. It will be observed that Pickleseimer, in his statement, fails to bring home notice to the conductor that he (Pickleseimer) had contracted or engaged to remain on the caboose and guard the wood. Nor does Pickleseimer even intimate that the conductor was present at any moment from the time Pickleseimer agreed to stay and guard the wood until he went forward fifteen or twenty feet, overtook the train and attempted to mount upon the rear car while in motion. Indeed, the fair inference from Pickleseimer's statement is that when the train moved slowly up, after being still during the time he was guarding the wood, and from the time the caboose was cut loose, the train did not stop, and that Pickleseimer got on the ground, went hurriedly forward, overtook the train (moving slowly) and attempted to climb on to the rear car thereof, and in making the attempt fell and received the injuries complained of. Pickleseimer does not intimate having had a conversation, or having heard one as detailed by Wood as to a negro man having had his brains knocked out, in which a "*little lad,* standing there on the bridge," said, "If you ride across, keep low or she will get you." This whole statement is, upon its face, incredible, and wholly inconsistent with that of Pickleseimer. It is not pretended that Pickleseimer's memory was affected by the injuries received by

him or otherwise. It is, therefore, incredible that the conversation could have happened, " there on the bridge," in which the mythical " *little lad* " dipped in and took part. It was too tragic—of too much importance to have been forgotten by Pickleseimer. Moreover, if this conversation occurred, it must have been just at the rear end of the train, and the train must have been still, and did not, after cutting loose from the caboose, continue moving slowly across the bridge, as is fairly inferable from Pickleseimer's statement. It took time, too, to have this conversation (if it occurred)—time, within which there was ample opportunity to have got on the car with ease. But, granting that the conversation did occur, it would prove very clearly, first, that Pickleseimer, by his own statement, having lost the opportunity of getting on the car by staying on the caboose to guard the wood, had a second opportunity to get on the car during the time occupied in the conversation alleged by this witness, Wood; for, after relating this pretended conversation, Wood says that, " Pickleseimer stepped to the right-hand corner and I to the left," etc. ; and, secondly, it would powerfully tend to prove that the conductor was remonstrating against Pickleseimer's just then declared purpose of riding on top; for Wood introduces the alleged conversation by the inquiry on his part: "are we going to ride or walk?" and Pickleseimer's reply, "I don't walk"; after which the alleged conversation between Pickleseimer and Wood and the conductor, participated in by the "*little lad* there on the bridge," occurrred.

If, as was evidently the purpose of Wood's statement to prove, the conductor contemplated an act of wilful negligence, by directing Pickleseimer to get on top of the car and then to cause the train to be put in motion while the attempt to get on top was being made, why would the conductor be telling them that a negro man had got his brains knocked out by a similar act of imprudence? And why did the "*little lad,* there on the bridge," chime in with the remark, " If you ride across, keep low or she will get you"? And why, under such circumstances, would

Pickleseimer persist in his previously announced purpose to ride on top, as evinced by his emphatic declaration, "*I don't walk,*" except that he had taken the matter in his own hands, and of his own will recklessly assumed the consequences of the extreme peril to which he exposed himself?

It is also worthy of remark, if Wood's statement is to be credited, that if the conductor was at the rear of the train when the alleged conversation occurred, he, as we must presume, had with him his conductor's lantern; for the night was dark and rainy, and the experience of all men is that conductors in the conduct of their trains have their lanterns with them on such occasions, and use them in signalling the movements of their trains. If, then, the conductor was there with his light, and was there at the time Pickleseimer attempted to get on the rear car, he must have walked over behind the train on the plank walk between the rails, and nothing could have been easier than for Pickleseimer and Wood to have walked over with him, their path lighted by his lamp. But, doubtless, the truth is that the conductor, having directed Pickleseimer and Wood how to cross over the river, had himself gone over on the engine of his train to North Danville to turn the train over to the conductor from that point to Richmond. In either event Pickleseimer was not left without light; for it is admitted that there was a lantern on the platform of the detached caboose only fifteen or twenty feet distant; and there must have been several lights near about, as will be seen by what this witness next proceeds to say, which is this: "As soon as the train passed I stepped on the plank and looked up between me and the skylight. I didn't see him (Pickleseimer) as the train moved off, and I called him three times by his name, and the third time I called the brakeman called to me and said, 'No, he ain't up, for I think I heard him fall,' and I looked over to the side and hollered two or three times down and got no answer. As I went around by the abutment with *two or three men* (italics the writer's)—*possibly* the same brakeman with lights—maybe there was *two or three* or

four lights, and there we found Pickleseimer lying in an uncon-
scious state. I took him up and rolled him about a little, and
asked some one present to go for a doctor. One man left us, I
supposed for a doctor, but he never came back. I asked if we
could not get something to rub on his face. One man said,
' There is no use doing anything for that man, for he is dead.'
I said, ' Never mind, let's do all we can for him.' I had my left
arm behind his back, and finally saw him wink his eyes, and it
was not so very long after that before two or three other men,
with myself, got him upon his feet. He walked terribly broken
down on one side, and he managed to walk up with two or three
people with lights. At any rate, I was at Pickleseimer's left
side, and possibly one or two walking at his back. In that way
we got across the river *and met Mr. Limeberry, the conductor
that came down with us from Charlotte. I asked if we could not
get some camphor, and gave* HIM *a dollar, and* HE *brought me
some brandy.*"

A little later (and very little), in his examination in chief,
this witness, Thos. Wood, was asked: Q. "Are you sure, Mr.
Wood, that there was no offer made on the part of the conductor
or anybody else to light you across this bridge?" Ans. "As
soon as we came to a halt I saw no more of him; *he made his
escape or fled.* (Laughter.)"

It is only necessary to compare, without comment, this answer,
so clearly intended not only to fasten wilful negligence upon
this conductor, but to blacken his character with infamy, with
the statement just previously made by him that, on getting
Pickleseimer across the river, he met Captain Limeberry, the
conductor from Charlotte to Danville, and asked *him* for camphor
and gave him some money, and he (Limeberry) bought some
brandy.

There is a vast deal more of even this witness' unbroken
statement in chief, and when we come to the point where he is
plied with a great number of questions in his continued exami-
nation in-chief and in his cross-examination, it would take more

than the space of even a very long opinion to refer to it all. Reference has been made to it sufficiently to illustrate its remarkable character, and to show that it is in conflict not only with Pickleseimer, but with itself.

Then, from the plaintiff's own testimony, he brought the misfortune of which he complains upon himself, and he cannot recover from the railroad company therefor. He had before shipped cattle over this company's road, and at that time the caboose was left on the South Danville side of Dan river, and another caboose attached on the North Danville side. He, then, on the occasion in question, knew how and what to do on arriving at South Danville. But, when the train stopped at Danville, instead of doing what his previous experience as well as judgment taught that he should do—instead of getting on top of the stock-car, as he first started to do—he entered into treaty with an irresponsible brakeman, who was at the end of his run and utterly without authority, to stay and guard wood for such person; and then, when it became necessary to abandon his place as wood-guard, he, in a dark, rainy night, when the cars were wet and slippery, attempts to repair the effects of his negligence and want of ordinary care by making an effort to mount upon top of a car, with his overcoat on and a clumsy satchel in his right hand, fell and was very seriously injured. He was guilty of an act which no sensible man in the exercise of ordinary care and caution could be expected to be guilty of. It was, in fact, a desperately rash act, superinduced by no imminent peril traceable to the negligence of the railroad company. No danger or peril was present except that which he rashly brought upon himself. It does not appear that any train was near and approaching from either direction. If, considering all the circumstances, Pickleseimer had thrown himself in front of the wheels of the moving train, with the foolhardy idea that the train would stop before hurting him, the recklessness of the act would have differed from what he did do only in degree, not in principle.

This case, therefore, does not fall within the class of cases where a passenger is excused for his rash act by reason of some imminent peril confronting him, due to the defendant's negligence ; as,ᵖ for instance, if a collision seems imminent and a passenger jumps from the train to save himself, and is injured, in which case the injured person has his action, though it may turn out that if ,he had remained on the train he would not have been injured. *Balto. & Ohio R. R. Co.* v. *McKenzie,* 81 Va. 71.

The case in hand belongs to that class of which the case of *R. & D. R. R. Co.* v. *Morris,* 31 Gratt. 200, is an example. In fact, the case here is ruled by that case. There the injured party, Morris, was a passenger in a caboose car attached to one of the company's freight trains, from Wolf Trap to South Boston, two stations on the company's road, in Halifax county. Soon after Morris entered the caboose he fell asleep. After the train had left the Wolf station, the conductor waked Morris and took in his ticket. When the train neared South Boston, the point of Morris destination, the conductor finding Morris again asleep, awoke him a second time and told him he was at South Boston. The train was then travelling at the rate of four miles per hour. It passed the freight-house and reception-room at the station without stopping, and when the locomotive reached the flag on the west side of the freight-house and reception-room, it stopped, and the conductor finding Morris still in the caboose asleep, again aroused him. The train stopped about a minute, and Morris could have gotten off while the train was not in motion. The conductor then went to the other end of the car, and, looking back, saw that Morris did not get up. He returned, shook him, and told him to get up he was at Boston. And Morris said that the conductor told him to get off. Immediately after waking Morris the last time, the conductor went out at the end of the caboose with his lantern in his hand and took his stand on the stationary platform about two and a half feet from the platform of the car ; the train commenced backing,

and Morris got up and walked out to the end of the car and jumped off, not knowing as he said, which way the car was going, and the caboose car and several other cars ran over and seriously and permanently injured him.

That was a much stronger case against the company than the present.

In delivering the unanimous opinion of this court in that case, Burks, J., said: "These facts, in our opinion, show the defendant to have been guilty of culpable negligence, and this negligence was a proximate cause of the plaintiff's injury. After the conductor discovered that the plaintiff, when aroused, did not get off while the train was standing for a very short period, but had again fallen asleep, and he found it necessary to wake him again, he should not have put the train in motion until the plaintiff could leave the car, or if put in motion, he should have cautioned him not to attempt to get off until the train was stopped. Instead of pursuing that course, the proof is that he told the plaintiff to get off, and the train immediately commenced backing, at what speed was not shown. The company was also in fault in not having stationary lights. There were none such, and the only lights used were the two hand-lanterns before mentioned. This defect made it all the more incumbent on the conductor to exercise more than usual care and caution in letting off passengers."

And Judge Burks further said: "While, however, the injury sustained by the plaintiff is directly traceable to the culpable negligence of the defendant as a cause, the evidence leaves no room for doubt that another cause, concurring with the first, was the negligence or absence of ordinary prudence and caution on the part of the plaintiff. He had time sufficient, according to the proof, to leave the car while the train was standing; and after he was cautioned the last time, if he had at once followed the conductor, who stepped on to the platform with the lantern in hand, he might have reached the platform with equal convenience and safety; or, if tarrying longer and finding the train

in motion, when told to get off, he should either have declined, as he had the right to do, to obey the direction, or if he chose to take the risk of getting off under the circumstances, he should have gotten off on the stationary platform, which, as shown, was alongside of the train. Such would have been the dictates of common prudence. He did not heed them, but according to his own statement, he got up, walked to the end of the car and 'jumped off,' not knowing nor seeking to know in which direction the train was moving. This would seem to be something more than the want of ordinary prudence and caution. It appears to be gross negligence—extreme recklessness."

It cannot be necessary to adduce arguments to show the perfect application of these remarks to every feature of the facts in the present case.

Grant, then, as we do, that the company in this case was culpably negligent in not having stationary lights and a better and safer walk, outside of the track, over this bridge, still the fact stands out in proof that Pickleseimer was, by reason of his own want of due care and caution, and by his own reckless act, the author of the misfortune which befell him, and, therefore, he cannot recover therefor of the railroad company.

The case might appropriately end here; but as it has to go back for a new trial in the court below, it is proper to refer briefly to an erroneous instruction given by the trial court, of its own motion, in lieu of the two instructions asked for by the defendant company and refused by the court.

The court, in the erroneous instruction thus given, after laying down the law upon the subject of contributory negligence, added: "But a plaintiff may, under certain circumstances, be entitled to recover damages for an injury, although he may, by his own negligence, have contributed to produce it." This addendum practically destroyed the effect of the previous portion of the instruction, which stated the law with substantial accuracy, and was much more calculated to confuse than to enlighten the jury upon the law applicable to the case. What was the

nature of the exceptional circumstances, alluded to in the instruction, is not stated by the court, but the jury were left to grope in the dark without light or sign to indicate the road to a right conclusion, and were, in fact, left to decide for themselves what circumstances ought to entitle a plaintiff to recover damages despite his own negligence. We do not see how argument can make plainer the error of the court in this particular.

For the reason aforesaid, our conclusion is that the court below erred—first, in misstating the law to the jury; and, second, in refusing to set aside the verdict and grant a new trial. The judgment must, therefore, be reversed, the verdict set aside and the cause remanded for a new trial to be had in accordance with the rules herein laid down.

JUDGMENT REVERSED.